UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DANIEL CARSTAIRS, on behalf of himself
and all others similarly situated,

Plaintiff,

- vs -

UNIVERSITY OF ROCHESTER,

Defendant.

Civil Action No.:
20-cv-06690-CJS

**DEFENDANT UNIVERSITY OF ROCHESTER'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

**NIXON PEABODY LLP**

Richard A. McGuirk
Daniel Deane *(Notice of Appearance to be filed)*
Kacey Houston Walker *(Notice of Appearance to be filed)*
Steven M. Richard *(Pro Hac Vice to be filed)*

1300 Clinton Square
Rochester, New York 14604
Tel.: (585) 263-1644
*Attorneys for Defendant University of Rochester*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 4

I.     THE UNIVERSITY'S POLICIES.................................................................................. 4

       A.     The Financial Responsibility Agreement............................................................ 4
       B.     The Undergraduate Bulletin................................................................................ 5
       C.     The Credit-Hour Policy...................................................................................... 5

II.    THE UNIVERSITY'S TRANSITION TO ONLINE LEARNING IN RESPONSE
       TO THE GLOBAL CORONAVIRUS PANDEMIC ........................................................ 7

III.   PLAINTIFF'S ALLEGATIONS ................................................................................... 8

LEGAL STANDARD.............................................................................................................. 9

ARGUMENT ...................................................................................................................... 10

I.     PLAINTIFF'S CLAIMS SOUND IN INACTIONABLE EDUCATIONAL
       MALPRACTICE ....................................................................................................... 10

II.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT ................. 12

       A.     Plaintiff Fails to Plausibly Allege a Specific Promise of In-Person
              Education Services............................................................................................ 12

              1.     New York law requires that Plaintiff identify "specific promises"
                     material to his relationship with the University that establish the
                     terms of the contract he alleges................................................................. 12
              2.     The Financial Responsibility Agreement bars Plaintiff's claims. ........... 14
              3.     Plaintiff cannot identify any specific promise of in-person
                     instruction. .............................................................................................. 15
              4.     Plaintiff cannot identify any specific promise to provide on-
                     campus resources or facilities. ................................................................. 18

       B.     Plaintiff Does Not Plausibly Allege a Breach...................................................... 19

III.   PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT ................... 21

       A.     Plaintiff Cannot Plead Unjust Enrichment in the Alternative Because an
              Implied Contract Governs His Relationship with the University ........................ 22
       B.     Plaintiff Cannot Demonstrate That Principles of Equity and Good
              Conscience Require Relief................................................................................. 23

IV.    PLAINTIFF'S REQUEST FOR RELIEF RELATED TO SEMESTERS
       FOLLOWING THE SPRING OF 2020 SHOULD BE DISMISSED .............................. 25

CONCLUSION.................................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................10

*Babiker v. Ross Univ. Sch. of Med.*,
  No. 98 CIV 1429 THK, 2000 WL 666342 (S.D.N.Y. May 19, 2000) ...................................20

*Bailey v. New York Law Sch.*,
  No. 16 CIV. 4283 (ER), 2017 WL 835190 (S.D.N.Y. Mar. 1, 2017)....................................13

*Baldridge v. State*,
  293 A.D.2d 941 (3d Dep't 2002) ........................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................................9

*Benham v. eCommission Sols., LLC*,
  118 A.D.3d 605 (1st Dep't 2014) .......................................................................................22

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006)................................................................................................22

*In Re Boston Univ. Covid-19 Refund Litig.*,
  No. 1-20-CV-10827-RGS, ECF No. 48 (D. Mass. Nov. 4, 2020)...................................16, 17

*In re Bristol–Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................................10

*Bristol Vill., Inc. v. Louisiana-Pac. Corp.*,
  916 F. Supp. 2d 357 (W.D.N.Y. 2013)................................................................................22

*Broder v. Cablevision Sys. Corp.*,
  418 F.3d 187 (2d Cir. 2005)..................................................................................................6

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)..................................................................................................4

*Cheves v. Trustees of Columbia Univ.*,
  89 A.D.3d 463 (1st Dep't 2011) .........................................................................................19

*Chira v. Columbia Univ. in N.Y. City*,
  289 F. Supp. 2d 477 (S.D.N.Y. 2003).................................................................................13

*Chong v. Ne. Univ.*,
No. CV 20-10844-RGS, 2020 WL 5847626 (D. Mass. Oct. 1, 2020)...............................14, 15

*Clarke v. Trustees of Columbia Univ. of City of N.Y.*,
No. 95 CIV. 10627 (PKL), 1996 WL 609271 (S.D.N.Y. Oct. 23, 1996) ................................19

*Donohue v. Copiague Union Free School District*,
47 N.Y.2d 440 (1979) ........................................................................................................10, 11

*ExamWorks, Inc. v. Soltys*,
No. 17-CV-0080-LJV-MJR, 2017 WL 4712206 (W.D.N.Y. Aug. 10, 2017).........................22

*FoxStone Grp., LLC v. Calvary Pentecostal Church, Inc.*,
173 A.D. 978 (2d Dep't 2019) ..................................................................................................23

*Gally v. Columbia Univ.*,
22 F. Supp. 2d 199 (S.D.N.Y. 1998)....................................................................................12, 24

*Gertler v. Goodgold*,
107 A.D.2d 481 (1st Dep't 1985) ..............................................................................................13

*Grutter v. Bollinger*,
539 U.S. 306 (2003).....................................................................................................................3

*Harris v. Mills*,
572 F.3d 66 (2d Cir. 2009)...........................................................................................................9

*Jeffers v. Am. Univ. of Antigua*,
125 A.D.3d 440 (1st Dep't 2015) ..............................................................................................23

*Jones v. Trustees of Union Coll.*,
92 A.D.3d 997 (3d Dep't 2012) .................................................................................................19

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000).......................................................................................................23

*Keefe v. New York Law Sch.*,
71 A.D.3d 569 (1st Dep't 2010) ....................................................................................14, 16, 18

*Maas v. Cornell Univ.*,
94 N.Y.2d 87 (1999) ............................................................................................................10, 13

*Munich Reins. Co. v. First Reins. Co. of Hartford*,
6 F.2d 742 (2d Cir. 1925).............................................................................................................7

*Olsson v. Bd. of Higher Ed.*,
49 N.Y.2d 408 (N.Y. 1980) ..................................................................................................10, 19

iii

*Paladino v. Adelphi Univ.*,
   89 A.D.2d 85 (2d Dep't 1982) ................................................................................11

*Papaspiridakos v. Educ. Affiliates, Inc.*,
   No. 10-CV-5628, 2013 WL 4899136 (E.D.N.Y. Sept. 11, 2013) ...........................11

*Paynter v. N.Y. Univ.*,
   64 Misc. 2d 226 (N.Y. Civ. Ct. 1970)....................................................................20

*Paynter v. New York University*,
   319 N.Y.S.2d 893 (N.Y. App. Term 1971)........................................................20, 21

*Pearson v. Walden Univ.*,
   144 F. Supp. 3d 503 (S.D.N.Y. 2015)....................................................................16

*Prasad v. Cornell Univ.*,
   No. 5:15-cv-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016)............................13

*Regents of Univ. of Calif. v. Bakke*,
   438 U.S. 265 (1978).................................................................................................3

*Rolph v. Hobart & William Smith Colls.*,
   271 F. Supp. 3d 386 (W.D.N.Y. 2017) ...................................................................13

*Routh v. Univ. of Rochester*,
   981 F. Supp. 2d 184 (W.D.N.Y. 2013) ..........................................................6, 12, 14

*Shilkoff, Inc. v. 885 Third Ave. Corp.*,
   299 A.D.2d 253 (1st Dep't 2002) ...........................................................................24

*Silverman v. N.Y. Univ. Sch. of Law*,
   193 A.D.2d 411 (1st Dep't 1993) ...........................................................................18

*Sirohi v. Lee*,
   222 A.D.2d 222 (1st Dep't 1995) ...........................................................................10

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957).................................................................................................3

*Tiu-Malabanan v. Univ. of Rochester*,
   No. 07-CV-6499-CJS, 2008 WL 788637 (W.D.N.Y. Mar. 21, 2008)....................20

*Turner v. Nazareth College*,
   No. 10-CV-6357T, 2011 WL 310787 (W.D.N.Y. Jan. 28, 2011) ...............10, 11, 12

*Universal Acupuncture Pain Servs., P.C. v. State Farm Mut. Auto. Ins. Co.*,
   196 F. Supp. 2d 378 (S.D.N.Y. 2002).....................................................................23

iv

*Vought v. Teachers Coll., Columbia Univ.*,
    127 A.D.2d 654 (1st Dep't 1997) ...........................................................................13

*Ward v. New York Univ.*,
    No. 99 CIV. 8733 (RCC), 2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) ..............................20

*Yalincak v. New York Univ.*,
    No. 3:08CV773 (PCD), 2009 WL 10714654 (D. Conn. Sept. 3, 2009).................................22

## Rules

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 9

## Other Authorities

N.Y. Exec. Order No. 202 (Mar. 7, 2020) ......................................................................7

4831-7864-0083.1

Defendant University of Rochester ("Rochester" or the "University") respectfully submits this memorandum of law in support of its motion to dismiss (the "Motion") the Complaint filed by plaintiff Daniel Carstairs ("Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

From the outset of the COVID-19 pandemic, the University has fulfilled its educational mission and responsibilities through prompt and necessary action to protect the health and safety of its community in the face of unprecedented and evolving challenges.  In March 2020, following federal and state emergency orders addressing COVID-19 and after half of the Spring 2020 semester was complete, Rochester made the appropriate and justified academic decision to convert its curriculum and instruction to a remote-learning platform to finish the last weeks of the semester in a manner that was consistent with applicable educational accreditation standards and the requirements of the New York State Education Department ("NYSED").  Because of the University's swift action, Rochester's undergraduate and graduate students continued to earn academic credits and progress toward their degrees and, with very few exceptions, their courses continued to be taught (albeit remotely) by the same talented Rochester faculty members. Rochester, for its part, continued to pay its ordinary fixed costs in providing educational services, and simultaneously dedicated substantial, additional resources and efforts to maintain the high quality of its educational offerings and assist students in adjusting to remote instruction.

Rochester's prompt assistance and necessary response to the pandemic went beyond its pedagogical support of its students.  The University allowed students who needed to remain on campus, including hundreds of international students, to live in the residence halls through the end of the semester.  For students who moved off-campus for the balance of the semester, the University refunded—at a substantial financial loss—a prorated portion of fees they had paid for

campus housing and meals.  Additionally, as Plaintiff states, the University disbursed nearly $3 million in federal CARES Act funding to over 4,400 students in financial need.  *See* Compl. ¶ 22.  Rochester also took specific steps to enable some of its students to join the fight against COVID-19.  Faced with medical-worker shortages across the country and in New York State, the University's School of Medicine and Dentistry graduated its Class of 2020 medical students approximately six weeks early.  This early graduation allowed them to help in combatting the pandemic at a dire time when COVID-19 patients were overwhelming parts of the medical system.  While graduating early to give back professionally, these University medical students still met or exceeded applicable New York State and accreditation requirements.[1]

Plaintiff acknowledges that the University's response to the pandemic "was warranted by circumstances."  Compl. ¶ 29.  And he does not allege that Rochester's shift to remote instruction impaired him in pursuing his degree and earning academic credits to progress to his graduation as he planned prior to the onset of the pandemic.  Rather, Plaintiff alleges that he is entitled to a refund because of his subjective belief that Rochester's remote instruction compelled by the impacts of the pandemic was of lower quality and value than what he would have received on campus.

Plaintiff's Complaint fails to cite any statement or document promising that Rochester students would always receive in-person instruction and access to on-campus facilities no matter what.  In fact, Plaintiff's core claim—that remote learning was somehow inferior to in-person education—is eviscerated by one of the few documents Plaintiff actually cites.  The University's Credit-Hour Policy specifically states that each online course at the University shall be

---

[1]    *See* Sandra Knispel, *Medical students graduate early to join pandemic fight*, Univ. of Rochester Newscenter (Apr. 9, 2020), https://www.rochester.edu/newscenter/medical-students-graduate-early-to-join-pandemic-fight-423812/ (last visited Dec. 4, 2020).

2

"equivalent to its face-to-face counterpart, which includes offering the same minimum level of instructional time and supplemental assignments as required by [NYSED]."

Nor does Plaintiff allege that the University breached any implied agreement by acting arbitrarily or in bad faith in transitioning to remote learning to protect the health and safety of its community. In essence, Plaintiff's allegations constitute an impermissible challenge to the quality of the University's academic offerings, which courts have appropriately and routinely rejected as a matter of law.

This Court should refrain from making qualitative assessments of Rochester's transition to remote learning in response to a global pandemic and its provision of services to effectuate that necessary transition. Any determination otherwise would interfere with the University's exercise of its academic freedom to fulfill its educational mission (especially during these unprecedented times). Judicial deference to a university's academic decisions protects "[a]cademic freedom," which "has been viewed as a special concern of the First Amendment." *Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265, 312 (1978). Universities are empowered with a strong degree of "educational autonomy," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), and the "four essential freedoms of a university" include deciding "who may teach, what may be taught, *how it shall be taught*, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result) (emphasis added).

Plaintiff fails to allege the necessary elements to plausibly state claims for breach of contract or unjust enrichment. New York law will enforce only specific promises in the university-student contractual relationship, and Plaintiff identifies no specific contract terms to justify the extraordinary relief that he demands. Similarly, Plaintiff's unjust-enrichment claim offers no plausible allegation that Rochester improperly retained funds or that equity and good

conscience require the refunds he seeks.  In fact, Plaintiff ignores the significant costs that

Rochester incurred to pivot quickly and transition appropriately to remote learning to enable its

students to continue with their academic coursework and progress toward their degrees.

## BACKGROUND

## I.    THE UNIVERSITY'S POLICIES

Rochester is a diverse research institution comprising seven schools spread across three

campuses.  *See* Compl. ¶ 21.  Its academic units include the College of Arts, Sciences &

Engineering (the "College") (in which Plaintiff is enrolled), the Eastman School of Music

("Eastman"), and graduate schools in business administration, education and human

development, medicine and dentistry, and nursing.  The diversity of student experiences at the

University is reflected in the school-specific policies that apply to students' relationships with

the institution, but certain key policies apply to all undergraduate students,[2] including Plaintiff:

### A.  The Financial Responsibility Agreement[3]

Every student who registers for classes at the University, including Plaintiff, agrees to be

bound by Rochester's Financial Responsibility Agreement ("FRA").  The FRA sets forth the

student's "Promise To Pay" fees and tuition by virtue of his or her registration for classes or

receipt of University services:

> Payment Of Fees/Promise To Pay:  I understand and agree that by
> registering as a student at UNIVERSITY OF ROCHESTER and/or

---

[2] On a motion to dismiss, the Court may consider documents that are incorporated by reference in or "integral to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[3] The Complaint alleges in conclusory fashion that a "binding contract" arises from Rochester's "student policies, the admission agreement, and payment of tuition and fees." Compl. ¶ 56.  Although Plaintiff fails to identify these documents by name or describe their material terms, the University understands his reference to terms concerning the "payment of tuition and fees" to refer to the Rochester document that covers such payments—i.e., the University's Financial Responsibility Agreement.   A copy of the FRA is attached to the Declaration of Robert L. Clark, Ph.D. ("Clark Decl.") at Exhibit A.

4

> receiving any services from UNIVERSITY OF ROCHESTER I
> accept full responsibility to pay all tuition, fees, and other associated
> charges assessed as a result of my registration and/or receipt of
> services. I understand this agreement will remain in effect during the
> time I attend the University.

Clark Decl. Ex. A at 1 & 3.  The FRA also limits the availability of refunds to circumstances

where a student "drop[s] or withdraw[s] from some or all of the classes" in accordance with the

University's "published tuition refund schedule," to which the FRA provides a link; it makes no

allowance for refunds under any other terms.  *Id.*

### B.  The Undergraduate Bulletin

Among the "student policies" applicable to all undergraduates (Compl. ¶ 56) is

Rochester's Official Bulletin – Undergraduate Studies 2019-2021[4] ("Undergraduate Bulletin"),

which provides general information on undergraduate education at the University, lists

applicable policies and procedures, and catalogs degree and academic-program offerings and the

anticipated academic calendars for the years it covers.  The first page of the Undergraduate

Bulletin advises students that its terms, and the terms of a Rochester education in general, are

subject to change: "The University reserves the right to make changes in its course offerings,

degree requirements, regulations, policies and procedures, and fees and expenses as educational

and financial considerations require."  Clark Decl. ¶ 6 & Ex. C at 1.  It thereafter reiterates that

"[c]hanges in programs, policies, and the academic calendar may occur."  *Id.*

### C.  The Credit-Hour Policy[5]

As an accredited institution that offers numerous degree and certificate programs, the

University assigns credit hours to all courses and programs of study in accordance with federal,

---

[4] *See* Clark Decl. ¶ 6 & Ex. C.  The Undergraduate Bulletin applies to the named Plaintiff's
claims, and as such, Rochester does not rely on its Graduate Bulletin in responding to the
Complaint.  The University reserves all rights.

[5] The Credit-Hour Policy should be considered on this Motion "since the pleading repeatedly

state, and accrediting standards.  The University's Credit-Hour Policy provides that "Rochester's credit-hour calculations for degree and certificate programs follow NYSED guidelines, which are based on the U.S. Department of Education's definition of *credit hour*."  Clark Decl. Ex. B at 1.  The Credit-Hour Policy recites NYSED's definition of "semester hour," which "requires at least 15 hours (of 50 minutes each) of instruction and at least 30 hours of supplementary assignments," as well as the U.S. Department of Education's definition of "credit hour" on which it is based.  *Id.*  After setting forth that framework, the Credit-Hour Policy codifies the University's own policies with respect to "Online Teaching and Learning Credit Hours" (*id.* at 2) and the College's specific credit-hour provisions (*id.* at 3).  Notably, the Credit-Hour Policy also establishes "the College's adherence to federal, state and university guidelines for the application of credit hours to undergraduate and graduate courses," which policies, combined, "mandate that each credit hour consists of one hour of faculty-led instruction and two hours of out-of-class supplementary work per week throughout the semester."  *Id.* at 2-3.

Contrary to Plaintiff's core assertion, the Credit-Hour Policy states that each of the University's online course offerings is "equivalent to its face-to-face counterpart" and meets the applicable state and federal credit-hour standards by providing "the same minimum level of instructional time and supplemental assignments (as face-to-face courses) as required by [NYSED] for each credit."  *Id.* at 2.  In addition to recognizing the validity of online delivery as

---

refers to the document and quotes it, in connection with [the plaintiff's] claim that the University violated its terms."  *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013) (Siragusa, J.).  Although the Complaint cites without explanation to what appears to be an undated, incomplete version of the Policy (*see* Compl., ¶ 24 n.2), the Court should consider the version of the Credit-Hour Policy operative in the Spring of 2020 and made available to Rochester students at that time.  *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (courts need not accept a complaint's description of the terms of an agreement on a motion to dismiss but may look to the agreement itself when the agreement is provided by the defendant).  A copy of the Credit-Hour Policy is attached to the Clark Declaration as Exhibit B.

an appropriate mode for classes at the University, the Credit-Hour Policy contemplates still more

flexibility with regard to the manner in which any course is delivered as follows:

> These policies allow for "equivalent" academic activities to replace
> faculty-led instructional time. An equivalent academic activity can
> include formally defined activities such as recitations, studios and
> laboratory sessions; however, it may also include additional
> independent academic work completed outside of class in less
> structured settings. In this case, the faculty-led instructional time,
> equivalent instructional time and supplementary work must equal
> the hours per week associated with the course credit hours.

*Id.* at 2-3.

## II.  THE UNIVERSITY'S TRANSITION TO ONLINE LEARNING IN RESPONSE TO THE GLOBAL CORONAVIRUS PANDEMIC

On March 7, 2020, New York declared a "disaster emergency" in the State in response to

the public-health threat posed by COVID-19.[6]  Seven weeks into Rochester's Spring semester,

while students were on Spring recess, the University implemented new guidance to limit the

impact of COVID-19 on the Rochester community on March 11, 2020.  *See* Compl. ¶ 28.  The

University announced that in-person instruction for its undergraduate and graduate students

would cease and instruction would take place online until the end of the semester.  *See* Compl. ¶¶

2, 5.  Following that announcement, Plaintiff alleges, "some classes were taught in an online

format beginning March 18, 2020."  Compl. ¶ 30.

---

[6]  N.Y. Exec. Order No. 202 (Mar. 7, 2020), *available at* https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf (last visited Dec. 4, 2020).  The Court may take judicial notice of the fact and terms of the executive order. *See, e.g.*, *Munich Reins. Co. v. First Reins. Co. of Hartford*, 6 F.2d 742, 746 (2d Cir. 1925).

III.    **PLAINTIFF'S ALLEGATIONS**

Plaintiff claims, in a conclusory manner, that he and the other putative class members "entered into a binding contract with Rochester" through "student policies, the admission agreement, and payment of tuition." *Id.* ¶ 56. Yet nowhere in his Complaint does he identify or state any specific alleged terms of the "student policies" and "admission agreement." Plaintiff nonetheless asserts that the University promised to provide students in-person instruction and access to facilities by virtue of a handful of nonspecific references to "direct faculty instruction"—implying, in contradiction to the Credit-Hour Policy, that "direct faculty instruction" cannot occur through online instruction. *See* Compl. ¶¶ 23-25. Although he "does not dispute that Rochester's decision to cease in-person instruction was warranted" (*id.* ¶ 3), and acknowledges that "[t]he online learning options Rochester offered for [the balance of] the Spring 2020" semester were "consistent with safety measures" (*id.* ¶ 39), Plaintiff claims that the University breached an unspecified contractual promise to provide in-person education services by transitioning to online learning as a result of the COVID-19 pandemic. *See, e.g.*, *id.* ¶ 33. He does not dispute, and appears to concede (*see id.* ¶ 14), that he received full academic credit for his Spring 2020 coursework and remains on schedule regarding his expected graduation date.

Plaintiff asserts that he and a putative class of persons who paid tuition and fees to Rochester "when classes and/or coursework were limited in whole or in part to online attendance as a result of or in connection with COVID-19" (*id.* ¶ 46) are entitled to subjectively calculated damages in the form of "disgorgement of the pro-rated portion of tuition and fees, proportionate to the amount of time that remained in the Spring 2020 semester when classes moved online and campus services ceased being provided, accounting for the value of classes canceled, the diminished value of educational opportunities, the reduced hours of instruction, as well as for

8

each subsequent semester and continuing until Rochester resumes in-person classes." *Id.* ¶ 44.

He suggests that the "diminished value" of the education he received in the last few weeks of the

Spring semester is demonstrated by what he contends is the "[i]nferiority of [o]nline

[e]ducational [e]xperience" generally.  Compl. at 8.  But he offers only one purported fact

regarding the alleged value of Rochester's online offerings specifically: i.e., that the lower value

of those courses is demonstrated by what Plaintiff claims (without citing any support) is the "vast

price difference in Rochester's in-person, on-campus programs versus [its] own online learning

program."  Compl. ¶ 42.  Plaintiff does not identify the source of the price figures he alleges (*see

id.* ¶ 43), and the University is not aware of any such cost differential for Rochester credit-

bearing offerings.  In fact, the University does not charge less for online courses than for in-

person courses (which the Credit-Hour Policy specifically states are "equivalent"), but it appears

upon investigation that the Eastman Community Music School—an offering for music students

in the community that does not provide University credit—lists an online course for students in

grades 9 through 12 at a discounted fee of $503, the exact amount that Plaintiff claims.[7]

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a

plaintiff must plead sufficient factual matter "to state a claim to relief that is plausible on its

face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although the Court "'must accept

as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal

conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice.'"  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In applying this standard, "[t]he court need not

---

[7] https://www.esm.rochester.edu/community/ap-music-theory/ (last visited Dec. 4, 2020).

accept as true an allegation that is contradicted by documents on which the complaint relies."

*Turner v. Nazareth College*, No. 10-CV-6357T, 2011 WL 310787, at *1 (W.D.N.Y. Jan. 28,

2011) (quoting *In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y.

2004)).  After "identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth," the Court then determines whether the remaining factual

allegations allow "the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678, 680.  "Determining whether a complaint states a plausible

claim for relief" is "a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Id.* at 679.

<u>**ARGUMENT**</u>

I.    **PLAINTIFF'S CLAIMS SOUND IN INACTIONABLE EDUCATIONAL MALPRACTICE**

      The Court should dismiss the Complaint in its entirety because it improperly seeks to

litigate "educational malpractice" claims that are inactionable under New York law, no matter

how the causes of action may be styled or labeled.  In recognition of the public-policy

determination that educational issues (such as the appropriate mode of instruction) must be "left to

the sound judgment of . . . professional educators," courts "exercise[] the utmost restraint in

applying traditional legal rules to disputes within the academic community." *Olsson v. Bd. of

Higher Ed.*, 49 N.Y.2d 408, 413 (N.Y. 1980); *Sirohi v. Lee*, 222 A.D.2d 222, 222 (1st Dep't

1995).  This well-established judicial deference to the academic judgments of educators compels

New York courts to take a "'restricted role' in dealing with and reviewing controversies involving

colleges and universities," *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999), and to decline to

address claims of "educational malpractice" that require them to assess the quality of instruction

offered by an institution.  As the New York Court of Appeals explained in *Donohue v. Copiague

*Union Free School District*, "[t]o entertain a cause of action for 'educational malpractice' would require the courts . . . to make judgments as to the validity of broad educational policies—a course we have unalteringly eschewed in the past."  47 N.Y.2d 440, 444–45 (1979).

Thus, "New York courts consistently decline to entertain actions sounding in tort-based 'educational malpractice,' where 'the essence of the complaint is that the school breached its agreement by failing to provide an effective education.'"  *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-CV-5628, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013) (quoting *Paladino v. Adelphi Univ.*, 89 A.D.2d 85 (2d Dep't 1982)), *aff'd*, 580 F. App'x 17 (2d Cir. 2014).  And because such claims for educational malpractice are not recognized under New York law, claims that "ask the Court to involve itself in the subjective professional judgments of trained educators will not survive a motion to dismiss merely because the plaintiff couches her claims in terms of breach of contract."  *Turner*, 2011 WL 310787, at *4 (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998)).

Although Plaintiff's Complaint casts his claims against Rochester in terms of breach of contract and unjust enrichment, both "sound in inactionable educational malpractice," *Papaspiridakos*, 580 F. App'x at 18, as evidenced by his reliance on allegations about the "inferiority" of online education that he claims does "less to promote academic success" than in-person instruction.  *See* Compl. ¶ 37; *see id.* at 8-9.  Thus, Plaintiff fails to state a cognizable cause of action because the Court cannot adjudicate his claims without abandoning its "restricted role" and second-guessing the academic judgment of the Rochester administrators and faculty who provided Plaintiff with what they determined to be an appropriate and effective education amidst the exigent circumstances of a global pandemic.  New York courts routinely grant motions to dismiss where, as here, a plaintiff's allegations claiming breach of an implied contract

11

amount to "nothing more than a claim for educational malpractice." *Turner*, 2011 WL 310787, at *4.  The Court should dismiss the Complaint on that basis alone.

## II.    PLAINTIFF FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

Independent of the dispositive bar against educational-malpractice claims under New York law, Plaintiff's claim for breach of contract fails to plausibly plead any specific, unconditional, enforceable promise by Rochester to provide in-person instruction or access to on-campus resources or facilities to form the basis of an implied contract between the parties. *See* Point II(A)(1), *infra*.  He cannot establish a contractual entitlement to in-person instruction or services in exchange for his payment of tuition and fees, especially where such payments are governed by the FRA, which ties the payment to registration and the receipt of services rather than to any particular mode of instruction.  *See* Points II(A)(2)-(4), *infra*.  Finally, Plaintiff's breach-of-contract claim should also be dismissed because the Complaint does not plausibly plead that the University breached any alleged promise by acting arbitrarily or in bad faith in transitioning to online learning to protect the health and wellbeing of its students in the face of a global pandemic and declarations of national and statewide emergencies.  *See* Point II(B), *infra*.

### A.  Plaintiff Fails to Plausibly Allege a Specific Promise of In-Person Education Services

#### 1.    New York law requires that Plaintiff identify "specific promises" material to his relationship with the University that establish the terms of the contract he alleges.

Under New York law, a university student may assert a claim for breach of an implied contract only in limited circumstances not applicable here.  *Routh*, 981 F. Supp. 2d at 207; *see Gally*, 22 F. Supp. 2d at 206–07 ("Not every dispute between a student and a university is amenable to a breach of contract claim.").  The implied contract provides that, "if the student complies with the terms prescribed by the university, he will obtain the degree he seeks."

*Baldridge v. State*, 293 A.D.2d 941, 942 (3d Dep't 2002) (internal quotation marks and citations omitted). But "only specific promises set forth in a school's bulletins, circulars and handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract." *Bailey v. New York Law Sch.*, No. 16 CIV. 4283 (ER), 2017 WL 835190, at *9 (S.D.N.Y. Mar. 1, 2017) (quoting *Keefe v. New York Law Sch.*, 71 A.D.3d 569, 570 (1st Dep't 2010)); *see Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (1st Dep't 1997).

Moreover, "a promise can be implied only where we may rightfully assume that it would have been made if attention had been drawn to it," and "is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate they intended to effect." *Gertler v. Goodgold*, 107 A.D.2d 481, 485 (1st Dep't) (internal quotation marks and citation omitted), *aff'd*, 66 N.Y.2d 946 (1985). Without such unequivocal evidence of a contractual commitment, the university cannot be presumed to have "relinquished its authority to make its own academic judgments and to administer and allocate its resources" in its discretion. *Id.*; *Chira v. Columbia Univ. in N.Y. City*, 289 F. Supp. 2d 477, 485–86 (S.D.N.Y. 2003) ("[t]he failure to identify the specific contract that [the university] allegedly breached makes it very difficult to properly characterize the nature of [plaintiff's] allegations—*i.e.,* as challenges to determinations within the wide discretion of the university or as a genuine breach of a contract").

Applying these controlling principles of deference to academic judgments and the "restricted role" that New York courts must maintain "in dealing with and reviewing controversies involving colleges and universities," *Maas*, 94 N.Y.2d at 92, courts dismiss claims for breach of contract, such as here, where plaintiffs fail to identify a clear, specific educational contractual right that the school allegedly breached. *See, e.g.*, *Bailey*, 2017 WL 835190, at *9; *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 407 (W.D.N.Y. 2017); *Prasad v.*

13

*Cornell Univ.*, Civil Action No. 5:15-cv-322, 2016 WL 3212079, at *20 (N.D.N.Y. Feb. 24, 2016); *Routh*, 981 F. Supp. 2d at 208.

> **2.      The Financial Responsibility Agreement bars Plaintiff's claims.**

In purporting to allege the promises that Plaintiff claims the University made "in exchange for" the payment of tuition and fees (Compl. ¶¶ 56-57), the Complaint conspicuously omits the terms of the one document that specifically sets forth the consideration provided by the University in exchange for such payment: the FRA.  The FRA governs, among other things, a student's payment of tuition and fees in exchange for his registering as a student, and thus is indisputably "material to the student's relationship with the school."  *Keefe*, 71 A.D.3d at 570. The FRA supplies critical terms of the contractual relationship between the University and its students—terms that foreclose Plaintiff's claims.

Under the FRA, all University students, including Plaintiff, make the following "Promise To Pay" as a condition of registering for classes: "I understand and agree that by registering as a student at . . . ROCHESTER and/or receiving any services from . . . ROCHESTER I accept full responsibility to pay all tuition, fees, and other associated charges assessed as a result of my registration and/or receipt of services."  Clark Decl. Ex. A at 1 & 3.  The U.S. District Court for the District of Massachusetts recently held that a nearly identical "promise to pay" in Northeastern University's financial-responsibility agreement did not support the claims of students seeking a tuition refund in connection with that institution's transition to online learning in the Spring of 2020.  *See Chong v. Ne. Univ.*, No. CV 20-10844-RGS, 2020 WL 5847626, at *3 (D. Mass. Oct. 1, 2020).  The *Chong* court reasoned that, because "[t]he FRA provides for students to 'pay all tuition, fees, and other associated costs' incurred as a result of 'registering for any class or receiving any service from Northeastern,'" it "ties the payment of tuition to

14

registration for courses, not to the receipt of any particular method of course instruction." *Id.* at *3. Finding that the plaintiffs failed to plausibly establish that the parties' agreement included a right to in-person instruction, the court dismissed their contract claim. *See id.*

So too here: by entering into the FRA and registering as a student at Rochester, Plaintiff explicitly "accept[ed] full responsibility to pay all tuition, fees, and other associated charges as a result of [his] registration and/or receipt of services," without regard to the mode of delivery of those classes or services. Plaintiff does not dispute that he registered for classes and received services (and full academic credit) from the University in the Spring of 2020, which, under the FRA, triggers his responsibility to pay all applicable tuition and fees. As in *Chong*, these material terms of the parties' relationship do not support Plaintiff's claimed entitlement to in-person instruction. Plaintiff's breach-of-contract claim fails on this dispositive ground.

### 3.     Plaintiff cannot identify any specific promise of in-person instruction.

Additionally, Plaintiff cannot sustain his claim for breach of contract because his Complaint is devoid of any allegation of a specific promise by the University to provide Plaintiff with a fully in-person educational experience in the Spring of 2020 under all circumstances.

The Complaint purports to describe the "Contract Terms" that Plaintiff accuses Rochester of breaching only in three numbered paragraphs. *See* Compl. ¶¶ 23-25. Plaintiff alleges (without citation to any particular University policy or publication) that, "in exchange for the payment of tuition, fees and other related costs," Rochester contracted to "provide an agreed-upon number of classes through in-person instruction and access to physical resources and school facilities such as libraries, laboratories, and classrooms." Compl. ¶ 24. He references three documents in an attempt to support this argument: a January 2017 memorandum addressed to Eastman faculty titled "Guidelines for online course development" (the "Eastman Faculty

Memo") (*see* Compl. ¶ 25 n.3); the University's Personnel Policy (*see* Compl. ¶ 25 n.4); and the

Credit-Hour Policy (*see* Compl. ¶ 24 n.2).[8]  None of these documents defines any specific terms

of the educational contract between Plaintiff and the University, nor supports his claims.

> ### a.  *The Eastman Faculty Memo and University Personnel Policy do not form the basis of an implied contract.*

Even if the Complaint accurately characterized the Eastman Faculty Memo and the

University's Personnel Policy—and it does not—those documents cannot supply the terms of

Plaintiff's contract with the University because they are not "material to the student's

relationship with the school."  *Keefe*, 71 A.D.3d at 570.  To the contrary, it is clear on the face of

these documents that they were directed to University employees rather than to students such as

Plaintiff.  And Plaintiff, unsurprisingly, does not allege that he ever read or became aware of the

terms of these documents at any time relevant to this action, nor that he ever relied in any

manner upon either of them.  *See Pearson v. Walden Univ.*, 144 F. Supp. 3d 503, 511 (S.D.N.Y.

2015); *see also In Re Boston Univ. Covid-19 Refund Litig.*, No. 1-20-CV-10827-RGS, ECF No.

48 (D. Mass. Nov. 4, 2020) (dismissing complaint that cited to "marketing materials which

generally imply the existence of in-person instruction" but did "not allege that any named

plaintiff ever read these materials – let alone that they relied on the materials in choosing to

enroll at BU").  Thus, Plaintiff does not and cannot plausibly allege that the Eastman Faculty

Memo or Rochester's Personnel Policy formed the basis of his relationship with the University.

---

[8] Plaintiff's passing mention of "the course catalog and course syllabus" (Compl. ¶ 24) is insufficient for at least two reasons.  First, Plaintiff offers no plausible, non-conclusory basis for inferring that the University linked the award of credit hours to "the education specified in the course catalog and course syllabus" (*id.*), as the Credit-Hour Policy makes no mention of these documents.  Second, Plaintiff does not allege the terms of these documents or identify any specific promise they contain, let alone any promise of in-person instruction.

4831-7864-0083.1

### b. *Contrary to Plaintiff's allegations, the Credit-Hour Policy specifically provides for online instruction.*

The only other "published policy" to which the Complaint specifically refers—the University's Credit-Hour Policy (Compl. ¶ 4)—not only fails to support Plaintiff's claim that the University promised to provide in-person instruction, it flatly contradicts that claim. The Complaint alleges that, pursuant to the Credit-Hour Policy, "a 'credit hour' is fifteen hours of 'classroom or direct faculty instruction' plus thirty additional 'hours of out-of-class student work.'"[9]  *Id.*  But the Complaint further alleges that "[o]nline instruction was not permitted as a substitute for 'direct faculty instruction'" except under certain conditions (Compl. ¶ 25), and that "Rochester could no longer provide the remaining eight hours of classroom/direct faculty instruction per credit hour" when it transitioned to online learning upon the onset of the pandemic (Compl. ¶ 7).  These allegations are contradicted by the terms of the Credit-Hour Policy, which expressly provides that each online course at the University shall be "equivalent to its face-to-face counterpart, which includes offering the same minimum level of instructional time and supplemental assignments as required by [NYSED]."  *Id.* at 2.  In fact, the Credit-Hour Policy goes even further, explaining that "online course instructional time may take different forms, including but not limited to, a combination of online synchronous class sessions, recorded lectures and narrated PowerPoint presentations, instructor-facilitated asynchronous discussion boards, instructor-facilitated asynchronous audio/video interaction, instructor-facilitated long-term projects, and one-on-one video communications with the instructors."  *Id.*

---

[9] The phrase "classroom or direct faculty instruction" does not derive from University policy, but rather from the U.S. Department of Education's definition of "credit hour."  *See* Clark Decl. Ex. B at 1.  Rochester's College Credit-Hour Policy, which "follows United States Department of Education and [NYSED] policies regarding credit hours," speaks instead of "faculty-led instruction" (or "'equivalent' academic activities to replace faculty-led instructional time"), and does not specify or imply any particular mode of "faculty-led instruction."  *Id.* at 3.

17

Far from "promis[ing] to provide in-person education services, including in-person instruction," as the Complaint alleges (Compl. ¶ 57), the Credit-Hour Policy that Plaintiff relies on explicitly states that the University may provide faculty-led instruction consistent with federal, state, and University policy through a variety of modes of online instruction.  *See Silverman v. N.Y. Univ. Sch. of Law*, 193 A.D.2d 411, 411 (1st Dep't 1993) (dismissing contract claim because the plaintiff's "allegations that defendants violated certain provisions of the Student Handbook are flatly contradicted by the Handbook itself").  The Credit-Hour Policy's express terms thus undercut, rather than support, Plaintiff's allegations.

### 4. Plaintiff cannot identify any specific promise to provide on-campus resources or facilities.

Plaintiff's allegations offer even less support for his contention that Rochester promised to provide him with "access to physical resources and school facilities such as libraries, laboratories, and classrooms" in exchange for his payment of tuition and certain unspecified fees. Compl. ¶ 23; *see id.* ¶ 9 ("students like Plaintiff paid hundreds of dollars in fees for services and access to facilities and equipment" for the Spring semester).  Despite its scattered references to facilities, the Complaint does not identify any contractual guarantee that the University would afford its students access to any particular facilities or resources in exchange for their payment of fees.  And the Complaint offers no detail at all about what fees Plaintiff paid (or indeed, whether Plaintiff himself—as opposed to "students like Plaintiff"—in fact paid any), or what "facilities and equipment," specifically, Plaintiff claims were tied to those fees.  *Id.*  Plaintiff thus fails to identify any "specific promise[]" by the University concerning access to facilities that constitutes a term of the parties' implied contract.  *Keefe*, 71 A.D.3d at 570.

Even if "student policies" such as the Undergraduate Bulletin or other materials vaguely alluded to (but not identified) by the Complaint (*see* Compl. ¶ 56) could be read to suggest that

18

the University generally makes certain "physical resources and school facilities" available to students in exchange for the payment of tuition and fees (*id.* ¶ 23), Plaintiff points to nothing that "guarantees unfettered, irrevocable access for [students] to the campus or its facilities." *Cheves v. Trustees of Columbia Univ.*, 89 A.D.3d 463, 464 (1st Dep't 2011) (brochure listing certain benefits and services generally available to alumni did not guarantee alumni access to campus); *see* Clark Decl. Ex. C at 1 (reserving the University's right to make changes to, among other things, its programs and policies). Without such a specific promise, Plaintiff cannot establish that the University promised him unqualified access to University facilities, even during a global pandemic and government-ordered operational limitations, as a condition of the parties' contractual relationship. Plaintiff's failure to identify any specific terms of the implied contract that he alleges the University breached by charging fees in the Spring of 2020 "is fatal to his claim." *Jones v. Trustees of Union Coll.*, 92 A.D.3d 997, 999 (3d Dep't 2012).

### B.  Plaintiff Does Not Plausibly Allege a Breach

Even if Plaintiff could identify any specific, enforceable promise of in-person education (which he cannot), his claim that the University broke that promise by transitioning to online learning in the midst of a global pandemic does not plausibly allege breach under New York law. To the extent that a contract is deemed to exist between a student and his university, "[t]he essence of the implied contract is that an academic institution must act in good faith in its dealings with its students." *Matter of Olsson*, 49 N.Y.2d at 414. "[B]ecause the decisions made by educational institutions about academic standards involve the subjective judgment of professional educators, claims regarding such matters are subject to judicial review only to determine whether [the defendants] abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational." *Clarke v. Trustees of Columbia Univ. of City of N.Y.*, No. 95 CIV. 10627 (PKL), 1996 WL 609271, at *6 (S.D.N.Y. Oct. 23, 1996)

19

(quoting *Gertler*, 107 A.D.2d at 485); *see Tiu-Malabanan v. Univ. of Rochester*, No. 07-CV-6499-CJS, 2008 WL 788637, at *5 (W.D.N.Y. Mar. 21, 2008) (Siragusa, J.); *Babiker v. Ross Univ. Sch. of Med.*, No. 98 CIV 1429 THK, 2000 WL 666342, at *7 (S.D.N.Y. May 19, 2000), *aff'd*, 86 F. App'x 457 (2d Cir. 2004).  Thus, courts applying New York law may dismiss a claim for breach of an implied contract where the pleadings do not establish that the university acted in bad faith.  *See Ward v. New York Univ.*, No. 99 CIV. 8733 (RCC), 2000 WL 1448641, at *5 (S.D.N.Y. Sept. 28, 2000) (dismissing contract claim for lack of "supporting evidence[] to suggest that defendants have either acted in bad faith, arbitrarily or irrationally").

New York law does not require strict compliance even with specific terms of an implied contract to provide educational services if the university exercises its academic discretion in good faith.  The case of *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Term 1971), illustrates the application of these principles to a university's decision to modify its academic program in light of exigent circumstances on campus and at large.

In *Paynter*, the plaintiff sought a tuition refund for instruction time claimed to have been lost when the defendant university suspended classes following the development of student anti-war protests.[10]  *See id.* at 893.  In reversing the trial court's judgment and dismissing the complaint, the Appellate Term acknowledged that, "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom."  *Id.* at

---

[10] In contrast to Rochester's transition to online learning for the balance of the Spring 2020 semester, which allowed for course instruction to continue remotely, the suspension of classes at issue in *Paynter* resulted in the loss of nineteen days of instructional time, during which time "[f]ormal classes were neither scheduled nor conducted."  *Paynter v. N.Y. Univ.*, 64 Misc. 2d 226, 227 (N.Y. Civ. Ct. 1970).

894.  Thus, notwithstanding the contractual relationship between the student and the university,

institutions of higher education "have inherent authority to maintain order on their campuses,"

and may make reasonable adjustments to their instructional programs without breaching that

contract.  *Id.*  The *Paynter* court concluded that, "[i]n the light of the events on the defendant's

campus and in college communities throughout the country" that prompted the suspension, "the

court erred in substituting its judgment for that of the University administrators and in

concluding that the University was unjustified in suspending classes for the time remaining in the

school year," and that such suspension did "not permit a recovery of tuition."  *Id.*

Thus, even where a court finds that an implied contract gives rise to a specific contractual

obligation, the university does not breach the implied contract by exercising its sound discretion

in fulfilling that obligation, especially in response to emergency circumstances.  The university

may exercise that discretion to safeguard the wellbeing of its students, as Rochester did in March

2020 to protect the health and safety of its community.

Plaintiff's pleading leaves no doubt that Rochester's exercise of its discretion to transition

to online learning to curb the spread of COVID-19 was reasonable, justified, and in good faith.

Plaintiff "does not dispute that Rochester's decision to cease in-person instruction was

warranted" (Compl. ¶ 3), and states that "[t]he online learning options Rochester offered" were

"consistent with safety measures" required in light of COVID-19 (Compl. ¶ 39).  Plaintiff's

admissions in this regard demonstrate the University's good-faith determinations to maintain

safety on its campus, and are fatal to his allegations of breach.

## III.    PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

Plaintiff asserts his second cause of action, for unjust enrichment, as an alternative to his

claim for breach of contract.  *See* Compl. ¶ 63.  That cause of action should be dismissed for two

4831-7864-0083.1

independent reasons: first, because it cannot be maintained in the alternative in light of the

implied contract between Plaintiff and the University, and second, because Plaintiff has not

pleaded and cannot plead the elements of an unjust-enrichment claim.

### A. Plaintiff Cannot Plead Unjust Enrichment in the Alternative Because an Implied Contract Governs His Relationship with the University

Although a claim for unjust enrichment may sometimes be pleaded in the alternative,

such a claim is "unavailable where it simply duplicates, or replaces, a conventional contract . . .

claim, and there is no bona fide dispute about the existence of" a contract between the parties.

*Bristol Vill., Inc. v. Louisiana-Pac. Corp.*, 916 F. Supp. 2d 357, 367 (W.D.N.Y. 2013) (internal

quotation marks and citations omitted); *see Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue*

*Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006).  In accordance with this rule, courts in this

circuit "often dismiss unjust enrichment claims at the pleadings stage where it is clear that there

is no dispute as to the existence of a contract between the parties or the fact that the contract

applies to the subject matter of the lawsuit."  *ExamWorks, Inc. v. Soltys*, No. 17-CV-0080-LJV-

MJR, 2017 WL 4712206, at *5 (W.D.N.Y. Aug. 10, 2017), *report and recommendation*

*adopted*, 2017 WL 4680410 (W.D.N.Y. Oct. 18, 2017).  A court must dismiss a claim for unjust

enrichment even where the breach-of-contract claim that it duplicates is not viable.  *See, e.g.*,

*Benham v. eCommission Sols., LLC*, 118 A.D.3d 605, 607 (1st Dep't 2014).

Plaintiff's unjust-enrichment claim should be dismissed on those grounds.  While

Plaintiff and Rochester disagree about the terms of the implied contract between them, there is

no dispute between the parties that such an implied contract exists by virtue of the student-

university relationship.  *See Yalincak v. New York Univ.*, No. 3:08CV773 (PCD), 2009 WL

10714654, at *14 (D. Conn. Sept. 3, 2009) ("as Plaintiff acknowledges, he and [the university]

had an implied contract" governed by the university's bulletins and regulations, which precluded

his equitable claim); *see also* Point II(A)(1), *supra*.  Moreover, Plaintiff's claim for unjust

enrichment is "indistinguishable" from, and duplicative of, his claim for breach of contract.

*Jeffers v. Am. Univ. of Antigua*, 125 A.D.3d 440, 443 (1st Dep't 2015).  Plaintiff's contract claim

thus bars his pursuit of an "alternative" cause of action.

### B.  Plaintiff Cannot Demonstrate That Principles of Equity and Good Conscience Require Relief

Plaintiff also cannot establish his entitlement to equitable relief.  "To prevail on a claim

for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2)

at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v.

Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  A "bare legal conclusion that it is against equity

and good conscience" to retain a benefit does not sufficiently allege that an asserted enrichment

was unjust.  *FoxStone Grp., LLC v. Calvary Pentecostal Church, Inc.*, 173 A.D.3d 978, 981 (2d

Dep't 2019).

Plaintiff concedes in his pleading that the University was justified in transitioning to

online learning in response to the coronavirus pandemic.  *See* Compl. ¶¶ 3 & 39.  Furthermore,

Plaintiff does not base his claims upon any allegation that Rochester failed entirely to provide

instruction or services during the online-learning period of the Spring 2020 semester, but rather

that the instruction and services that the University provided were, in Plaintiff's view, less

valuable because they were delivered remotely rather than face-to-face.  *See* Compl. ¶ 67 ("[t]he

online education services Rochester substituted for the in-person education for which Plaintiff

and class members paid has substantially lesser value"); *cf. Universal Acupuncture Pain Servs.,

P.C. v. State Farm Mut. Auto. Ins. Co.*, 196 F. Supp. 2d 378, 387 (S.D.N.Y. 2002) (dismissing

unjust-enrichment claim where insureds received the benefit of services rendered).  And because

Plaintiff promised under the FRA to pay tuition and fees in order to register for classes and

receive services from the University—conditions that Plaintiff admits were satisfied—it was not

unjust, as a matter of law, for the University to retain such payments.[11]  *See Shilkoff, Inc. v. 885*

*Third Ave. Corp.*, 299 A.D.2d 253, 253–54 (1st Dep't 2002) ("it was not unjust for [the

defendant] to retain funds obtained pursuant to its clear contractual right").  Against that

backdrop, "equity and good conscience" do not support Plaintiff's claim for restitution, and the

Complaint does not plead a plausible entitlement to relief for unjust enrichment.

   Plaintiff's unjust-enrichment claim must fail for the further reason that the relief Plaintiff

seeks would require the Court to venture into assessing subjectively the value of the education

that Plaintiff received during the online-instruction period—precisely the sort of determination

that New York courts avoid in accordance with public policy and out of deference to

universities' academic freedom.  *See* Point I, *supra*.  In *Gally v. Columbia University*, the court

held that the plaintiff's allegation that certain conduct "devalued the educational services that

[the defendant] had promised to provide her . . . would require the Court to engage in an

evaluation of the process of learning and school administration."  22 F. Supp. 2d at 207.  This,

the court concluded, was "the essence of an educational malpractice claim," and thus did not

state a cause of action on which relief could be granted.  *Id.*

   Determining the relative merits of different modes of instruction (and ascribing particular

monetary values to them) requires the sort of exercise of academic judgment that New York

courts have long left to the professional discretion of trained educators and university

administrators.  Because Plaintiff's claim for unjust enrichment cannot be adjudicated without

---

  [11] Tellingly, although Plaintiff pleads that he and other Class members "paid monies due for
tuition, fees, and related expenses" (Compl. ¶ 58) and that Rochester "has retained tuition monies
. . . and refuses to issue a corresponding tuition adjustment" (*id.* ¶ 59), he does not allege that the
University retained his fee payments.  *See generally id.*  In fact, the University refunded prorated
portions of certain fees paid by Plaintiff and others for the Spring 2020 semester.

impinging on the University's academic freedom and wading into the forbidden waters of educational malpractice, Count II should be dismissed on these additional grounds.

IV.     **PLAINTIFF'S REQUEST FOR RELIEF RELATED TO SEMESTERS FOLLOWING THE SPRING OF 2020 SHOULD BE DISMISSED**

Although the Complaint focuses on Rochester's transition to online learning at the onset of the pandemic in the Spring of 2020, it also purports to seek relief for "each subsequent semester and continuing until Rochester resumes in-person classes." Compl. ¶ 44. That request should be dismissed for all of the same reasons as Plaintiff's claims related to the Spring semester, as discussed above, and for two additional reasons. First, the Complaint fails entirely to plead factual matter concerning the circumstances of instruction and availability of in-person services and facilities beyond the Spring of 2020, and thus does not state a plausible entitlement for relief as to any later semester. Second, the University made unmistakably clear that online instruction would play a key role in Rochester's plan to meet its educational mission and deliver its learning objectives during the continuing health crisis and communicated modifications to service and facility access that the University deemed necessary to keep its students and community safe. *See* Compl. ¶ 31. On these facts, Plaintiff cannot plausibly allege that Rochester made or breached any promise of in-person instruction with respect to the Fall of 2020, or pursue prospective relief.

## <u>CONCLUSION</u>

For the foregoing reasons, Rochester respectfully requests that the Court dismiss Plaintiff's Complaint in its entirety.

4831-7864-0083.1

Dated: December 4, 2020          **NIXON PEABODY LLP**
       Rochester, New York

By: <u>/s/ Richard McGuirk</u>
     Richard A. McGuirk
     Daniel Deane *(Notice of Appearance to be filed)*
     Kacey Houston Walker *(Notice of Appearance to be filed)*
     Steven M. Richard *(Pro Hac Vice to be filed)*

     1300 Clinton Square
     Rochester, New York 14604
     Tel.: (585) 263-1644
     rmcguirk@nixonpeabody.com
     *Attorneys for Defendant University of Rochester*